Ryan P. Steen, AK Bar No. 0912084
Jeffrey W. Leppo, AK Bar No. 0001003
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington  98101
Phone:  (206) 386-7610
Fax:  (206) 386-7500
Email: rpsteen@stoel.com
         jwleppo@stoel.com

*Attorneys for Plaintiff Freezer Longline Coalition*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FREEZER LONGLINE COALITION,<br><br>        Plaintiff,<br><br>v.<br><br>JANE LUBCHENCO, in her official capacity as Administrator, National Oceanic and Atmospheric Administration; NATIONAL MARINE FISHERIES SERVICE; JAMES W. BALSIGER, in his official capacity as NMFS Alaska Region Administrator; and GARY LOCKE, in his official capacity as the United States Secretary of Commerce,<br><br>        Defendants. | Civil Action No.:  _____<br><br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF, AND PETITION FOR REVIEW (42 U.S.C. § 4332; 16 U.S.C. § 1535, 1536; 16 U.S.C. §§ 1801-1891d; 5 U.S.C. §§ 601-612; 5 U.S.C. §§ 553, 701-706)** |

## SUMMARY OF ACTION

1.      Plaintiff, a coalition of owners and operators of freezer longline vessels that fish

for Pacific cod in federal waters off the coast of Alaska, brings this civil action on behalf of its

members asserting causes of action against the above-named Federal Defendants ("Defendants"

or, collectively, "NMFS" or the "Agency") under various federal laws to challenge decisions

Freezer Longline Coalition v. Jane Lubchenco et al.

that, as explained further below, are fundamentally inconsistent with (i) the best available scientific and commercial information, (ii) sound fishery management practices, (iii) sensible protected resource conservation practices, (iv) past management practices and findings regarding the Pacific cod fisheries, (v) past findings made by NMFS regarding the effect of longline fishing on the environment, and (vi) the legal and regulatory responsibilities of the Defendants.

2.     Plaintiff challenges a final Biological Opinion (the "BiOp"), including its Reasonable and Prudent Alternative ("RPA"), prepared by NMFS pursuant to its authority under the ESA, which considered the potential effects of "authorization of groundfish fisheries under the Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area; authorization of groundfish fisheries under the Fishery Management Plan for Groundfish of the Gulf of Alaska; and State of Alaska parallel groundfish fisheries" on certain endangered species.  Among other things, the BiOp evaluates the potential effects of the Bering Sea and Aleutian Islands ("BSAI") and Gulf of Alaska ("GOA") groundfish fisheries on the western distinct population segment of Steller sea lions ("western DPS") and its designated critical habitat.  Plaintiff also challenges the Agency's accompanying final Environmental Assessment and Regulatory Impact Review ("EA/RIR") and Finding of No Significant Impact ("FONSI") prepared under the National Environmental Policy Act ("NEPA") and the Interim Final Rule which implements the RPA in the BiOp.  *See* NOAA, Interim Final Rule, Fisheries of the Exclusive Economic Zone off Alaska; Steller Sea Lion Protection Measures for the Bering Sea and Aleutian Islands, Groundfish Fisheries Off Alaska, 75 Fed. Reg. 77,535 (Dec. 13, 2010) ("Interim Final Rule").

3.     In preparing and issuing the BiOp, the RPA, the EA/RIR and FONSI, and the Interim Final Rule, NMFS has failed to comply with:  (1) the Endangered Species Act ("ESA"),

Freezer Longline Coalition v. Jane Lubchenco et al.

16 U.S.C. §§ 1531-1544; (2) the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1819d; (3) NEPA, 42 U.S.C. §§ 4321-4370(h); the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 505, 551-559, 701-706; and (5) the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601-612.

4.      Plaintiff seeks a declaration that the BiOp, and the acceptance and implementation thereof, the EA/RIR and FONSI, and the Interim Final Rule are arbitrary, capricious, and an abuse of discretion, not in accordance with law, and in excess of statutory jurisdiction, authority, or limitations.  In addition, Plaintiff seeks to enjoin Defendants from enforcing, relying on, or applying the BiOp, RPA, EA/RIR, FONSI, and the Interim Final Rule.  Finally, Plaintiff seeks an order vacating the Interim Final Rule and remanding, as appropriate, the BiOp, EA/RIR, and FONSI to the Defendants to reconsider them based on the Court's findings and rulings and in a manner consistent with applicable law.

5.      Plaintiff respectfully requests expedited consideration of this matter pursuant to 16 U.S.C. § 1855(f)(4).

## PARTIES

### Plaintiff

6.      Plaintiff, the Freezer Longline Coalition, is a § 501(c)(3) non-profit corporation, which represents the owners and operators of the vessels that participate in the freezer longline sector, Public Law 108-447, of the Pacific cod fishery in the federal waters of the BSAI and the GOA (referred to in this Complaint as the "longline catcher processors" or the "longline fishery").  The longline catcher processors provide approximately 1,200 full-time equivalent jobs and has more than 30 modern vessels with fish processing and freezing capabilities on board.

Freezer Longline Coalition v. Jane Lubchenco et al.

Coalition members hold federal license limitation program permits with federal Pacific cod endorsements issued by NMFS allowing their vessels to participate in the longline fishery.

7.      Plaintiff's mission is to promote public policy that facilitates the intelligent and orderly harvest of Pacific cod and other groundfish species in the Bering Sea/Aleutian Islands, encourage the reduction of waste and improvement of resource utilization in the longline fishery, and the reduction of incidental catch of non-target species in the longline fisheries, to support research and public education about the longline fisheries, and to represent longline fishery interests in matters concerning the management and regulation of the longline fishery with respect to target species and protected resources.  The relief Plaintiff seeks in this lawsuit is germane to its organizational purpose.

8.      Plaintiff and its members are committed to the protection of the environment of the BSAI and GOA, and to ensuring that the living marine resources of the BSAI and GOA are managed and conserved to enhance the health and productivity of the ecosystem.  Indeed, the BSAI freezer longline fishery is the first cod fishery in the world to obtain certification by the Marine Stewardship Council as a sustainable, eco-friendly, and well-managed fishery.

9.      Plaintiff's members' abilities to pursue their traditional fisheries will be severely and immediately impacted by the implementation of the Interim Final Rule.

10.      Plaintiff fully participated, to the limited extent allowed by NMFS, in the proceedings leading up to the Agency's decisions challenged in this lawsuit, including submitting detailed comments on the draft BiOp and accompanying draft EA/RIR, and also through public testimony.

11.      Plaintiff has standing to bring this action, and the challenged agency decisions are final and ripe for review by this Court.

Freezer Longline Coalition v. Jane Lubchenco et al.

**Defendants**

12.     NMFS is an agency of the National Oceanographic and Atmospheric Administration ("NOAA"), United States Department of Commerce.  Among its duties, NMFS is responsible for managing commercial marine fisheries to ensure sustainable harvests that provide the greatest overall benefit to the nation pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") and for administration of the ESA with respect to marine species that are listed as threatened or endangered under that statute.

13.     Defendant Gary Locke is the Secretary of the United States Department of Commerce and is being sued in his official capacity.  Secretary Locke directs all business of the Department of Commerce, including NOAA and its agency, NMFS.  Through these agencies, Secretary Locke is, among other duties and obligations, responsible for administering the ESA with respect to Steller sea lions and for promoting effective management and stewardship of the nation's fisheries resources and assets to ensure sustainable economic opportunities.  The Secretary is also ultimately responsible for the approval of the BiOp, the RPA, the EA/RIR and FONSI, and the Interim Final Rule and for the Department of Commerce's compliance with federal law, including the ESA, NEPA, MSA, RFA, and APA.

14.     Defendant Jane Lubchenco is the Administrator of the NOAA and is being sued in her official capacity.  The Secretary of Commerce has delegated responsibility to the Administrator and NOAA to ensure compliance with the ESA, NEPA, MSA, RFA and APA, which in turn has sub-delegated this responsibility to NMFS, and to promote effective management and stewardship of the nation's fisheries resources and assets to ensure sustainable economic opportunities.

Freezer Longline Coalition v. Jane Lubchenco et al.

15.     Defendant James Balsiger is the Administrator of the NMFS Alaska Region and is being sued in his official capacity.  Dr. Balsiger is the signatory official for the BiOp and the listed responsible official for the EA/RIR.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgments), 28 U.S.C. § 2202 (injunctive relief), and 16 U.S.C. §§ 1855(f) and 1861(d) (MSA). Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. §1855(f).

17.     Plaintiff has exhausted all administrative remedies.

18.     Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because this action is brought against NMFS and officers of agencies of the United States in their official capacities.  A substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this District, and the consequences of these events and omissions will substantially impact lands, waters, and communities situated within this District.  The NMFS Alaska Region was the lead agency for the EA/RIR and its Administrator is the signatory official for the BiOp and the listed responsible official for the EA/RIR.

## STATUTORY FRAMEWORK

### The Endangered Species Act

19.     The ESA was enacted by Congress to establish a comprehensive program for the conservation of species identified as threatened or endangered.  Primary authority for administering and enforcing the ESA vests with the Secretaries of Commerce (for marine

species) and Interior (for terrestrial and freshwater species).  The Secretary of Commerce has

delegated responsibility for administration and enforcement of the ESA to NMFS.

Section 7 of the ESA establishes an interagency consultation process to ensure federal actions do

not jeopardize listed species or destroy or adversely modify critical habitat.  16 U.S.C. § 1536;

50 C.F.R. § 402.14.  Under this process, a federal agency proposing to authorize, fund or carry

out an action that "may affect" a listed marine species must initiate formal consultation with

NMFS.  16 U.S.C. § 1536(a)(2); 50 U.S.C. § 402.14(a).  Where, as here, NMFS is both the

agency undertaking the action under consultation (the "action agency"), and the agency

conducting the consultation (the "consulting agency"), NMFS must engage in an intra-agency

consultation with itself to comply with Section 7 of the ESA.

  20.  During formal consultation, NMFS must review all relevant information provided

by the action agency or otherwise available and formulate its biological opinion as to whether the

effects of the action, together with cumulative effects, are likely to "jeopardize the continued

existence of listed species or result in the destruction or adverse modification of critical habitat."

50 C.F.R. § 402.14(g)(1)-(4).

  21.  "Jeopardize the continued existence of" is defined as engaging in an action that

"reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of

both the survival and recovery of a listed species in the wild by reducing the reproduction,

numbers, or distribution of that species."  50 C.F.R. § 402.02.  A biological opinion issued by

NMFS provides the agency's determination either that an action is likely to jeopardize (a

"jeopardy opinion") or not likely to jeopardize (a "no jeopardy opinion") listed species.  50

C.F.R. § 402.14(h)(3).

22.     Courts have construed the ESA Section 7 "destruction or adverse modification" of critical habitat standard, 16 U.S.C. § 1536(a)(2), as requiring the Agency to consider the value of critical habitat for the recovery of the listed species, and to address whether the loss of conservation function in affected habitat will appreciably diminish the value of the critical habitat *as a whole* for the species' survival or recovery.

23.     If NMFS determines in a biological opinion that a proposed action will jeopardize the continued existence of a threatened or endangered species or destroy or adversely modify its designated critical habitat, NMFS must suggest, if possible, RPAs that it believes will avoid jeopardy and adverse modification and allow the agency to proceed with the action.  16 U.S.C. § 1536(a)(2), -(b)(3)(A).

24.     In fulfilling NMFS's responsibilities under the ESA, including the issuance of biological opinions and RPAs, NMFS "shall use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation."  50 C.F.R. § 402.14(g)(8); 16 U.S.C. § 1536(a)(2).

**The Magnuson-Stevens Fishery and Conservation Management Act**

25.     The MSA is the primary domestic legislation governing management of federal fisheries.  16 U.S.C. §§ 1801-1891d.

26.     The MSA created eight regional fishery management councils that are primarily charged with preparing Fishery Management Plans ("FMPs") and plan amendments for each managed federal fishery.  16 U.S.C. § 1852(a)(1).

27.     The North Pacific Fisheries Management Council ("NPFMC") manages fisheries in the Exclusive Economic Zone off Alaska coast.  FMPs initiated by the NPFMC govern the

Freezer Longline Coalition v. Jane Lubchenco et al.

management of groundfish fisheries in the BSAI and GOA, including but not limited to the Pacific cod fishery, in which Plaintiff's members participate.

28.     Fishery management councils submit proposed FMPs and FMP amendments to the Secretary for review and approval.  16 U.S.C. §§ 1853, 1854.  The Secretary, acting through NMFS, must disapprove a FMP amendment to the extent it is inconsistent with provisions of the MSA or any other applicable law.  *Id*.  The Secretary must give notice of proposed rulemaking and provide an opportunity for public comment on proposed regulations.  *Id*.

29.     The MSA provides that any fishery management regulation shall be consistent with ten National Standards for fishery management and conservation.  16 U.S.C. § 1851(a).  In issuing a closure of a fishery under the MSA, NMFS should ensure that such closure (i) is based on the best scientific information available; (ii) includes criteria to assess the conservation benefit of the closed area; (iii) establishes a timetable for review of the closed area's performance that is consistent with the purposes of the closed area; and (iv) is based on an assessment of the benefits and impacts of the closure, including its size, in relation to other management measures, including the benefits and impacts of limiting access to users of the area, overall fishing activity, fishery science, and fishery and marine conservation.  16 U.S.C. § 1853(b)(2)(C).

30.     Approvals of FMPs, FMP amendments, and implementing regulations are subject to the procedural requirements of NEPA, 42 U.S.C. §§ 4321 *et seq*.; 16 U.S.C. § 1854(i).  The federal action that was the subject of this consultation under the ESA and which resulted in the issuance of the BiOp is the continued authorization of the BSAI/GOA groundfish fisheries by the Secretary.

## The National Environmental Policy Act

31.     Congress established NEPA as "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA and its implementing regulations require that federal agencies, including the Agency, must prepare an environmental impact statement for all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1501.4.  The purpose of NEPA is to ensure that federal decision-making is fully and publicly informed through a reasonably thorough and thoughtful analysis of the probable environmental impacts resulting from a proposed federal action, and through identification and analysis of a reasonable range of alternative actions, including the no-action alternative.  In enacting NEPA, Congress required federal agencies to comply with the Act "to the fullest extent possible."  42 U.S.C. § 4332(C).  Compliance with NEPA furthers the goals of the ESA where, as here, agency actions have immediate and potentially significant adverse effects on the human environment.

32.     NEPA requires that a federal agency proposing a major federal action with significant environmental effects prepare a detailed statement, which must include the environmental impacts of and alternatives to the proposed action.  42 U.S.C. § 4332(2)(C)(i), -(iii).  This detailed written statement is an Environmental Impact Statement  ("EIS").  40 C.F.R. § 1508.11.

33.     To determine whether an EIS is necessary, an agency may first prepare an Environmental Assessment ("EA").  *See id*. §§ 1501.4(c), 1508.9.  An EA is a "concise public document...that serves to...[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]."  *Id*. § 1508.9.  An EA must contain sufficient

Freezer Longline Coalition v. Jane Lubchenco et al.

information and analysis to determine whether the proposed action is likely to have significant impacts, thus requiring preparation of an EIS.  *Id.*

34.     If an agency concludes, based on the EA, that an EIS is not required, it must prepare a FONSI, which explains the agency's reasons for its decision.  *Id.* §§ 1501.4(e), 1508.13.

35.     The analysis of alternatives to a proposed agency action is "the heart of the NEPA document" and agencies should "[r]igorously explore and objectively evaluate all reasonable alternatives."  *Id.* § 1502.14(a).  The analysis must include a "no action" alternative, as well as reasonable alternatives beyond the agency's jurisdiction.  *Id.* § 1502.14(c)-(d).  These alternative analysis requirements also apply to EAs.  *See* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b). Whether an action will have "significant" impacts requires consideration of both the context and intensity of effects.  40 C.F.R. § 1508.27.  Context refers to the significance of the action to society as a whole, the affected region, the affected interests, and the locality.  *Id.* § 1508.27(a). Intensity refers to the severity of the impacts.  Factors considered in evaluating intensity include impacts that may be both beneficial and adverse, unique characteristics of the geographic areas, the degree to which the effects on the quality of the human environment are likely to be controversial, the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, the degree to which the action may establish a precedent for future actions, whether the action is related to other actions with individually insignificant but cumulatively significant impacts, and the degree to which the action may adversely affect an endangered or threatened species or its critical habitat.  *Id.* § 1508.27(b).

## The Administrative Procedure Act

36.     The APA provides for judicial review of final agency action by persons
"aggrieved" by such action.  5 U.S.C. § 702.  The actions reviewable under the APA include any
"preliminary, procedural, or intermediate agency action or ruling . . . on the review of the final
agency action."  *Id*. § 704.

37.     The APA also provides standards applicable when a federal agency proposes and
adopts final rules and regulations.  *Id*. §§ 553, 551(4).  Specifically, agencies must provide
"[g]eneral notice" of any "proposed rule making" to the public through publication in the Federal
Register.  That notice must include: "(1) a statement of the time, place, and nature of the public
rule making proceedings; (2) reference to the legal authority under which the rule is proposed;
and (3) either the terms or substance of the proposed rule or a description of the subjects and
issues involved."  *Id*. § 553(b).  An agency's responsibility to consider public comments on a
proposed rulemaking is required by 5 U.S.C. § 553(c).

38.     Under the APA, a reviewing court shall "hold unlawful and set aside agency
action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A reviewing court shall also
"hold unlawful and set aside agency action, findings, and conclusions found to be . . . without
observance of procedure required by law."  5 U.S.C. § 706(2)(D).

## The Regulatory Flexibility Act

39.     The RFA requires an agency, concurrent with proposing a new rule, to prepare a
Regulatory Flexibility Analysis describing the impact of the proposed rule on small businesses
and small governments.  5 U.S.C. § 601; *id*. at § 603, amended by Pub. L. No. 111-203, 124 Stat.

1376 (2010).  After receiving public comment, the agency then prepares a final Regulatory Flexibility Analysis to be published with the final rule.  *Id*. § 604.

40.     The agency is also required to make an extra effort to collect the input of small businesses and small governments on the proposed rule's impact by conducting open hearings, directly notifying small entities of the proposed rules, or publishing notice in trade publications. *Id*. § 609.

## STATEMENT OF FACTS

### Steller Sea Lions and Previous Biological Opinions

41.     Steller sea lions (*Eumetopias jubatus*) are classified within the Order Carnivora, Suborder Pinnipedia, Family Otariidae and Subfamily Otariinae, and are the largest otariid. Steller sea lions are generalist predators that consume a wide variety of fishes and cephalopods, including, occasionally, other marine mammals and birds.  Prey species are believed to vary seasonally and include herring, eulachon, capelin, salmon, pollock, Atka mackerel, arrowtooth flounder, Pacific cod, rock sole, Irish lords, and sand lance.  In the Aleutian Islands, Atka mackerel is the dominant species in total groundfish biomass and in the diet of Steller sea lions.

42.     The range of Steller sea lions extends from northern Japan, the Kuril Islands and the Okhotsk Sea, through the Aleutian Islands and Bering Sea, along Alaska's southern coast and south to California.  In 2008, the worldwide population of Steller sea lions was estimated to be over 130,000 animals.

43.     In the 1950s, the worldwide population of Steller sea lions was estimated by the Agency at 240,000 to 300,000 animals.  By 1990, the U.S. portion of the population had allegedly declined by approximately 80%.  In 1990, NMFS listed the Steller sea lion as a threatened species under the ESA.  55 Fed. Reg. 12,645 (April 5, 1990).

Freezer Longline Coalition v. Jane Lubchenco et al.

44.     In 1993, NMFS designated critical habitat for the Steller sea lion based on the location of terrestrial rookery and haul out sites, spatial extent of foraging trips and availability of prey.  In the 1993 final rule, NMFS stated that the essential at-sea activity in aquatic habitat areas is presumed to be feeding and access to adequate food resources.  58 Fed. Reg. 45,269 (Aug. 27, 1993).

45.     In 1997, NMFS reclassified Steller sea lions into two distinct population segments under the ESA.  NMFS then changed the status of the western DPS from threatened to endangered.  In 2008, the western DPS was estimated to consist of approximately 70,000 to 75,000 animals (approximately 50,000 animals in the United States and 20,000 to 25,000 in Russia) and the eastern DPS of approximately 63,000 animals.

46.     In 2000 and 2001, NMFS prepared biological opinions on the effects of the federal groundfish fisheries on Steller sea lions, which NMFS supplemented in 2003. The 2000 biological opinion and its supplement implemented Steller sea lion protection measures for the BSAI and GOA groundfish fisheries.  In formulating its 2000 biological opinion, NMFS concluded that "the hook and line fishery does fish in a manner that is consistent with the intent to minimize disturbance to the prey field [for Steller sea lions].  NOAA Fisheries recognizes that and for that reason, NOAA Fisheries is allowing hook and line fishing during periods that other fishing is restricted."  The current BiOp, RPA, and Interim Final Rule directly contradict NMFS's previous finding despite the fact that there is no new scientific or commercial information that contradicts or otherwise calls into question NMFS's previous finding.

47.     In a 2001 biological opinion, NMFS changed course and recommended the inclusion of the longline catcher processors in the RPA restrictions.  However, this decision was made based on incorrect data.  Specifically, in reaching its conclusions, NMFS relied upon data

that *overestimated* the longline catcher processors' weekly harvest by approximately 5,000 metric tons (roughly double the actual weekly harvest). The longline catcher processors promptly brought this error to NMFS's attention and NMFS later expressly acknowledged the error in writing. NMFS's acknowledgement of the error was provided to NMFS in the comments submitted by the fishery on the draft BiOp.

48.     In the last 10 years, the Steller sea lion population for the western DPS has increased and is trending towards recovery. Recent data on population trends indicate that the western DPS as a whole has stabilized and overall is increasing with a +14% increase in non-pups (2000 to 2008) and a +12% increase in pups (2000-01 to 2009). The western DPS SSL population is increasing within a significant portion of its range with the exception of two sub-regions at the edge of the range where the sub-populations are not increasing as rapidly or be distributed as NMFS may desire.

49.     A definitive cause for these limited sub-regional population numbers has not been identified. Although Steller sea lion populations in two sub-regions have not shown population growth, there is little to no existing information suggesting that nutritional stress, and annual harvests of Pacific cod and Atka mackerel in particular, are the cause.

**The Longline Catcher Processor Fishery**

50.     Pacific cod (*Gadus macrocephalus*) is distributed widely in the North Pacific, including the eastern Bering Sea and Aleutian Islands, and is managed as a single unit in the two areas. It is the second largest directed fishery in the Aleutian Islands. Pacific cod is neither overfished nor approaching an overfished condition. Pacific cod is caught by vessels in the BSAI and GOA using multiple gear types, including trawl, longline, pot, and jig.

51.     The longline catcher processor Cfishery is primarily a Pacific cod single-species directed fishery and, therefore, is nearly fully reliant on Pacific cod.  Indeed, over 90% of the longline fishery's income derives from directed fishing for Pacific cod.  The vessels that participate in the longline fishery - "freezer longliners" - are unique vessels that use specialized lines and individually baited hooks (as opposed to nets or pots) to catch fish.  The fishing and processing methods used by the fishery have little to no impact on the ocean floor, ensure a low rate of bycatch mortality, and produce the highest quality products for the highest market prices.

52.     The longline catcher processors' catch of Pacific cod in the Aleutian Islands is proportionately very small and spatially and temporally dispersed compared to trawl fleets that target Pacific cod.  Longline vessels fish by using individually baited hooks that are spaced apart on a long continuous line.  The pace of longline fishing is slow and spaced over large geographical regions.  The longline fishery is economically viable because of the relatively higher prices paid for longline-caught cod.  Longline vessels are able to target on larger fish that have higher value.  The low catch level by the longline catcher processors in the Aleutian Islands is offset by the high value of the cod.  Cod buyers are willing to pay high price for longline fish primarily because:  (i) the fish are caught one-at-a-time on single hooks and are alive with little or no bruising; (ii) fish are bled immediately upon landing; and (iii) the fishery targets the high proportion of large fish that exist in Aleutian Islands fishing grounds.  This all leads to obtaining strong prices on the international market for the exceptionally high-quality Alaska longline cod, and particularly the larger Aleutian Islands cod, including cod caught in Areas 541, 542, and 543.  This set of circumstances is unique and replacement for the larger Aleutian Islands fish simply does not exist in other areas available to the longline catcher processors.  Consequently,

loss of fishing in the Aleutian Islands cannot be mitigated or supplemented by moving the longline fishery to other areas.

53.     The size selectivity of Pacific cod caught by the longline catcher processors has very little overlap with the size of Pacific cod consumed by Steller sea lions.  For example, studies indicate that 80% of Pacific cod eaten by Steller sea lions are approximately 50 cm in length, while the average length of fish caught in the longline fishery is 67 cm.  In fact, approximately 93% of the fish caught by the longline fishery are larger than those consumed on average by Steller sea lions.

54.     Plaintiff's members are geographically, legally, logistically, and practically constrained from expanding effort in locations outside of the Aleutian Islands to fish for Pacific cod.  Restrictions on expanding effort in current fisheries and participating in fisheries outside the BSAI and GOA cod fisheries limit the ability of the longline fleet to mitigate losses suffered under the Interim Final Rule.

**2010 Biological Opinion and Environmental Assessment/Regulatory Impact Review**

55.     In October 2005, the Council recommended that NMFS reinitiate an FMP-level formal ESA Section 7 consultation on the effects of the federal groundfish fisheries on ESA-listed species under Department of Commerce jurisdiction.  In April 2006, the NMFS Alaska Region's Sustainable Fisheries Division sent a written request to the Protected Resources Division of the Alaska Region to evaluate the possible effects of status quo management practices for groundfish fisheries in the BSAI and GOA on Steller sea lions and other ESA-listed species in light of new information gained and management actions taken since the last biological opinion was supplemented in 2003.  The accompanying biological assessment concluded that the eastern and western DPS of the Steller sea lion were likely to be adversely

affected by the proposed action.  In June 2006, the Protected Resources Division concurred with the request and the findings of the biological assessment and formally initiated consultation pursuant to section 7 of the ESA.

56.     On December 26, 2007, NMFS published a notice of intent to prepare a supplemental EIS ("SEIS") on revisions to the Steller sea lion protection measures in the BSAI. 72 Fed. Reg. 72,992.  NMFS and the Council had determined that an SEIS might be required for those measures because they "may result in significant impacts on the human environment not previously analyzed in the Final SEIS for Steller Sea Lion Protection Measures (November 2001)."  NMFS identified primary issues to be analyzed as the effects of the proposed action and its alternatives on:  Steller sea lions and their critical habitat; other ESA- and MMPA-listed species; target and non-target fish stocks; seabirds; the ecosystem; and social and economic impacts.  The Agency stated its intention to consider specific social and economic impacts on: "(1) those who participate in harvesting the groundfish resources; (2) those who process and market groundfish and groundfish products; (3) those who consume groundfish products; (4) those who rely on living marine resources in the management area, particularly Steller sea lions, for subsistence needs; (5) those who benefit from nonconsumptive uses of Steller sea lions and other living marine resources; and (6) fishing communities."  *Id*. at 72,994.

57.     On August 2, 2010, NMFS released a draft biological opinion ("Draft BiOp"). NMFS concluded in the Draft BiOp that "from a weight of evidence perspective" that current federal management of the groundfish fisheries is likely to jeopardize the continued existence of the western DPS.  NMFS further found that "the relative intensity of groundfish fisheries as currently prosecuted in the western and central Aleutian Islands sub-regions, particularly within critical habitat, is negatively associated with Steller sea lion population trends since 2000 and

that these adverse effects on the availability of important Steller sea lion prey within critical habitat are exacerbated in areas of low ecosystem productivity and habitat spatial heterogeneity" and therefore the proposed action is likely to adversely modify the designated critical habitat for the western DPS.  Draft BiOp at xxvii-xxxii.

58.     NMFS included one RPA in the draft BiOp consisting of multiple management measures that it maintained were "designed to ameliorate adverse effects of removing prey biomass and avoid competition in the short- and long-term."  *Id*. at xxxii.  According to NMFS, the RPA was structured to mitigate effects of the fishery in newly created "Rookery Cluster Areas" or "RCAs" in the western and central Aleutian Islands where Steller sea lion abundance continues to decline, by closing Atka mackerel and Pacific cod fisheries in Fishery Management Area 543 in the western Aleutian Islands, and restricting such fisheries in the adjacent Areas 542 and 541 in the central Aleutian Islands.  *See id*. at xxxiii-xxxv.

59.     On August 2, 2010, NMFS also released an incomplete draft of an EA/RIR under NEPA that evaluated proposed federal action based on the RPA in the Draft BiOp.  The EA/RIR considered only three alternatives: (1) the "Status Quo" alternative, under which fisheries would continue to be managed under existing policy; (2) the "Enhanced Conservation Approach," which would be even more protective of Steller sea lions than the RPA by closing larger areas to fishing; and (3) the "RPA Specific Approach," which would implement the proposed RPA.  See Revisions to the Steller Sea Lion Protection Measures for the Aleutian Islands Atka Mackerel and Pacific Cod Fisheries, Council Review Draft EA/RIR (Aug. 2010) ("draft EA/RIR") at ii-iv.  On August 2, 2010, NMFS initiated a 25-day comment period on the draft documents, which collectively consisted of more than 1,000 pages. That period was later extended by seven days.

Freezer Longline Coalition v. Jane Lubchenco et al.

60.     During the public comment period, the NPFMC and its Advisory Panel and Scientific and Statistical Committee ("SSC") highlighted significant concerns about NMFS's analyses in the Draft BiOp, noting that the Draft BiOp contained conclusions that "still have a great deal of uncertainty about them" and that were not consistent with existing scientific information.

61.     On September 3, 2010, Plaintiff provided extensive comments in response to and in disagreement with the draft BiOp, including the proposed RPA, the draft EA/RIR, and the process being followed by the Agency.  Plaintiffs provided NMFS with, among other relevant information, scientific and commercial data supporting a determination that the jeopardy/adverse modification finding based on the current conduct of the longline catcher processors was not warranted.  NMFS received over 10,600 public comments on the Draft BiOp and the draft EA/RIR, the vast majority of which were form letters.  It received eight alternatives for proposed RPAs in addition to the RPA in the Council's August 20 motion.  NMFS has not provided written responses to the comments received and, specifically, NMFS has not responded to the 26 pages of comments that were timely provided by Plaintiff.

62.     In NPFMC public testimony and in public comments on the Bi-Op, the Plaintiff pointed out that the 2008 catch for the longline catcher processors was misstated.  It appears that despite these complaints and confirmation from NMFS that the numbers are incorrect the catch remains misstated in the final Bi-Op.

63.     During a briefing at the Council's October 2010 meeting, NMFS stated, without explanation, that it had determined that the Council's proposed RPA would not eliminate jeopardy and adverse modification, and therefore would not be adopted by the Agency.

64.    On December 8, 2010, NMFS released the BiOp to the public.  The BiOp was signed by James W. Balsiger and dated November 24, 2010.

65.    In the BiOp, NMFS again concluded that negative growth rates and counts in Fishery Management Areas 543, 542 and 541 in the western and central Aleutian Islands (which differ from the Recovery Plan Sub-regions) indicate that Steller sea lions were having difficulty maintaining or increasing their populations and that elimination of the effects of the removal of prey by commercial fisheries in those areas was needed to ensure fisheries activities were not likely to cause jeopardy or adverse modification.  *See* BiOp at xxiv-xxxiii. The BiOp concluded that, although Steller sea lions in two of the subareas established in the BiOp were having difficulty maintaining or increasing their populations, no two adjacent Recovery Plan Sub-regions were experiencing significant declines as defined in the Recovery Plan.  In fact, using the Recovery Plan Sub-regions, the populations as estimated by the Agency in the central Aleutians appear to be stable and the populations in the eastern Aleutians appear to be increasing.

66.    The RPA in the BiOp ("Final RPA") would severely and substantially modify groundfish management in the Aleutian Islands.  The Final RPA, as implemented through the Interim Final Rule prohibits the retention of Pacific cod inside and outside of Steller sea lion critical habitat in Area 543 in the western Aleutian Islands.  With respect to the cod longline fishery, the Final RPA sets forth new restrictions on the cod longline fishery, including, but not limited to:

    (i)    closure of waters 0 nm to 6 nm in Steller sea lion critical habitat year-round in Area 542;

    (ii)    closure of waters 0 nm to 20 nm in Steller sea lion critical habitat from January 1 to March 1 for vessels greater than 60 feet in Area 542;

Freezer Longline Coalition v. Jane Lubchenco et al.

(iii)  closure of waters from 0 nm to 10 nm in Steller sea lion critical habitat, as well as Seguam Pass, year-round in Area 541; and

(iv)  closure of waters 10 nm to 20 nm in Steller sea lion critical habitat from January 1 to March 1 in Area 541.

Each of these of closures negatively and detrimentally affects the longline catcher processors.

67.  On December 8, 2010, the Agency issued the final EA/RIR and a FONSI.

68.  On December 13, 2010, the Agency published an Interim Final Rule to implement the Final RPA commencing on January 1, 2011.  The Agency also announced that "NMFS must reinitiate ESA consultation" if the amount of fishing for Pacific cod by trawl and non-trawl gear in Areas 541 and 542 increases beyond recent historical amounts, defined as the maximum annual harvest amounts from 2007 to 2009.  See 75 Fed. Reg. 77,535 (Dec. 13, 2010).  The 2007-2009 time period selected by NMFS represented three years with abnormally and significantly low annual harvest amounts.

69.  In the Interim Final Rule, the Agency improperly relied upon 5 U.S.C. § 553(b)(3)(B) to declare that it had "good cause" to find that notice and public comment on the actions taken in the Interim Final Rule "would be impracticable and contrary to the public interest."  The Agency also improperly relied upon 5 U.S.C. § 553(d)(3) in declaring that it had "good cause" to waive the standard 30-day delay in effectiveness of a final rule.

70.  The Agency issued the Interim Final Rule without providing the public with an opportunity to comment on the rule itself.

**Impacts to Plaintiff**

71.  Generally, the closure and restriction of groundfish fisheries in the Aleutian Islands under the Interim Final Rule will have serious and far-reaching adverse consequences on

the State, multiple industry sectors, and the people of Alaska and the Pacific Northwest states who rely on the fishing industry for employment - particularly those in heavily fishing-dependent communities such as Adak, Atka, Dutch Harbor, Akutan, King Cove, and Sand Point, with an even greater effect on the smallest communities.  *See, e.g., State of Alaska v. Lubchenco et al.*, No. 3:10-cv-00271 at TT 75-80 (D. Alaska filed Dec. 14, 2010); Final EA/RIR, Ch. 10.  These adverse consequences will be unique, severe, and immediate for Plaintiff's members.

72.    In its August 2010 Council Review Draft of the EA/RIR, NMFS estimated the present value of fishing and related revenue at risk from implementation of RPAs 2 and 3 as between $1.8 and $3.8 billion. NMFS, Revisions to the Steller Sea Lion Protection Measures for the Aleutian Islands Atka Mackerel and Pacific Cod Fisheries, Council Review Draft Environmental Assessment/Regulatory Impact Review at 10-78 to 10-79 (Aug. 2010) ("August 2010 Draft EA/RIR").

73.    In its Final EA/RIR, NMFS admits that implementing the Final RPA will result in massive losses to fishing companies dependent on Aleutian Island fisheries, anticipating a loss of annual gross revenue between $44 million and $61 million.  Final EA/RIR at 10-147. NMFS also concludes that the longline fishery would experience a loss in yearly gross revenues of approximately $6 - $7 million.  *Id*.  However, this estimate grossly *underestimates* the actual losses that Plaintiff's members will incur as a direct result of the RPA and the Interim Final Rule. Without explanation, NMFS fails to estimate the net present value of fishing and related revenue at risk from implementation of the Final RPA.

74.    Plaintiff's members cannot make up all of the losses of their Pacific cod fishing opportunities elsewhere.  Moving effort into the Bering Sea, with existing restrictions on bycatch of halibut and other prohibited species, including anticipated changes in the Bering Sea /

Aleutian Island Pacific cod split, will limit Plaintiff's ability to shift directed fishing for cod to the Bering Sea. Indeed, forcing the longline catcher processors to shift effort to areas other than the Aleutian Islands could result in increases in halibut bycatch and sea bird bycatch, particularly potential increase of takes of short-tailed albatross, a ESA-listed species. Cod fishing is managed in a different manner in the GOA; GOA Sector allocations for Pacific cod are planned to be implemented by NMFS in 2012, making it impossible for Plaintiff's members to recoup their losses by fishing in the GOA.

75.     In addition to losing their directed fisheries, which represent for some vessels over 50 percent of their revenues, Plaintiff's members anticipate that jobs and income for their employees and owners will be permanently and significantly diminished. NMFS itself estimates that implementation of the Final RPA will result in job losses in the fishing industry from approximately 250 to 750 positions. Id. at 10-148.

## FIRST CLAIM FOR RELIEF

**(Violation of ESA and APA - Jeopardy and Adverse Modification Determinations)**

76.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

77.     NMFS violated ESA Section 7, 16 U.S.C. § 1536, in preparing and issuing the BiOp and in reaching its jeopardy and adverse modification determinations because, among other things:

A.     NMFS failed to accurately assess the current status of western Steller sea lions and the groundfish fisheries;

B.     NMFS failed to establish a connection between fisheries generally, and specifically the longline catcher processors, and the western Steller sea lion population. By its own terms, the BiOp fails to show any consensus that such a

connection exists.  Furthermore, NMFS failed to consider *its own data* showing

that the longline fishery does not remove biomass at a rate that compromises the

prey field for Steller sea lions.

C.      NMFS failed to establish a connection between Pacific cod biomass in the areas

        fished by the longline catcher processors and the western Steller sea lion

        population.

D.      NMFS disregarded or ignored relevant data and information without explanation

        and did not rely upon the best available science in reaching the conclusions set

        forth in the BiOp.  For example, NMFS ignored a specific study, authorized by

        the United States Congress and overseen by NMFS (Final Report, Fixed Gear --

        Marine Mammals Interactions Study, 6 April 2008, Donald Calkins, Managing

        Director), which concluded that fishing does not deplete the stock of prey for the

        western Steller sea lion and, as such, does not threaten the continued existence of

        the species.

E.      NMFS failed to recognize and incorporate into its findings the facts that:

        (i)      the longline fishery is small and spatially dispersed across areas and,

                consequently, has a relatively small amount of catch from Areas 541, 542,

                and 543;

        (ii)     the longline fishery has the most temporally dispersed seasonal

                apportionments of harvest of all gear types fishing in the BSAI, having

                effort in 46 of the 52 statistical weeks over recent years;

        (iii)    the size selectivity of Pacific cod by the longline fishery has very little

                overlap with the size of Pacific cod consumed by Steller sea lions;

Freezer Longline Coalition v. Jane Lubchenco et al.

    (iv)    75% of the annual longline catcher processors' effort is prosecuted during the time that Pacific cod is not an important food item for the Steller sea lion (i.e., at times when the frequency of occurrence of Pacific cod in the Steller sea lion diet is estimated at 6%);

    (v)    the proportion of Pacific cod biomass to overall groundfish biomass is on average 3% in Area 543 and 6% in Areas 542 and 543; and

    (vi)    the best scientific information and commercial data available indicates that Steller sea lions in the western and central Aleutian Islands are not experiencing nutritional stress, and there is little or no existing information that nutritional stress, and annual harvests of Pacific cod are the cause of allegedly slower than desired Steller sea lion recovery.

F.    NMFS relied upon speculative, conclusory, and untested determinations without providing sufficient explanation or analyses linking those determinations to specific data and information.

G.    NMFS failed to involve the Steller Sea Lion Mitigation Committee, a committee formed by NMFS, in the development of the BiOp.

H.    NMFS improperly based its adverse modification and jeopardy determinations on the status of Steller sea lions and fishery effects analyses in geographical subareas created solely for purposes of the BiOp and not based on the status of the western DPS as a whole.  NMFS unlawfully made its jeopardy determination based on alleged effects occurring at less than the species level and unlawfully failed to determine whether alleged effects of the longline fishery would cause adverse modification to western Steller sea lion critical habitat as a whole.  NMFS also

improperly relied on Steller sea lion recovery plan goals in making its adverse modification determination.

I.      NMFS failed to properly assess the progress of the western Steller sea lion DPS in meeting recovery goals and failed to reasonably demonstrate that the longline fishery has an effect on the DPS's recovery.

J.      NMFS reached conclusions that were directly contrary to findings and conclusions made in earlier biological opinions regarding the effect (or lack thereof) of the longline fishery on Steller sea lions.

K.      NMFS failed to sufficiently respond to public comments on the draft BiOp.

78.     In reaching its jeopardy and adverse modification determinations NMFS violated 16 U.S.C. § 1536(a)(2) by failing to "use the best scientific and commercial data available" and in failing to "give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation."

79.     The APA authorizes reviewing courts to set aside federal agency action that is arbitrary, capricious, an abuse of discretion, and not in accordance with the law.  5 U.S.C. § 706(2).

80.     The Agency's jeopardy and adverse modification determinations and its analyses in the BiOp violate ESA Section 7, 17 U.S.C. § 1536, and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, or without observance of procedure required by law, in violation of the APA, 5 U.S.C. § 706.  These actions by NMFS have caused or threaten serious prejudice and injury to Plaintiff's rights and interests.

Freezer Longline Coalition v. Jane Lubchenco et al.

## SECOND CLAIM FOR RELIEF

### (Violation of the ESA and APA - Reasonable and Prudent Alternative)

81.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

82.     The Final RPA is based upon the flawed and unsubstantiated premise that the Pacific cod fisheries, and particularly the longline fishery, in the Aleutian Islands cause jeopardy or adverse modification to the western DPS, and a flawed conclusion that the measures in the Final RPA are necessary to avoid jeopardy or adverse modification of critical habitat.  The Final RPA is not based upon a proper and lawful analysis of the effects of the proposed federal action that would be added to the environmental baseline, or upon a proper analysis of whether the effects of the proposed federal action would likely jeopardize the continued existence of the western DPS or adversely modify its critical habitat.  The BiOp fails to explain how and why the Final RPA will avoid the jeopardy and adverse modification of critical habitat that would otherwise be caused by the proposed federal action. The Final RPA is not based upon, and is contrary to, the best available scientific data and commercial information.

83.     The Agency failed to consider important factors relevant to the determination and development of a reasonable and prudent alternative.  The BiOp fails to make the necessary findings or undertake necessary analysis of whether the Final RPA "can be implemented in a manner consistent with the intended purpose of the action" including but not limited to:

A.      The BiOp fails to make distinctions among gear types and, specifically, failed to demonstrate how the longline fishery contributes to jeopardy or adverse modification;

B.      The BiOp fails to consider whether there are less onerous alternatives that will provide comparable likely benefit to the western DPS while better maintaining the conservation and management of fishery resources;

C.      The BiOp fails to make findings or undertake any analysis of whether the Final RPA is "economically or technologically feasible";

D.      The BiOp fails to contain findings or analysis of the economic cost of undertaking the Final RPA;

E.      The BiOp fails to adequately explain how and why each component of the RPA it identifies will avoid the jeopardy and adverse modification of critical habitat that allegedly would otherwise be caused by continued fishing in the Aleutian Islands pursuant to the Steller sea lion protection measures that are currently in place;

F.      The BiOp fails to analyze or determine how the impacts to the commercial fisheries and Aleutian Island communities compare or relate to the expected benefits to the western DPS;

G.      The BiOp fails to make meaningful distinctions among prey species and, specifically, failed to demonstrate how harvest of longline Pacific cod contributes to jeopardy or adverse modification;

H.      The BiOp reaches conclusions that are directly contrary to findings and conclusions made in earlier biological opinions regarding the effect (or lack thereof) of the longline fishery and Steller sea lions.  NMFS offers no scientific or otherwise reasonable justification for its contradictory findings.

Freezer Longline Coalition v. Jane Lubchenco et al.

84.     The APA authorizes reviewing courts to set aside federal agency action that is arbitrary, capricious, an abuse of discretion, and not in accordance with the law.  5 U.S.C. § 706(2).

85.     NMFS's identification and acceptance of the Final RPA violates Section 7 of the ESA, 16 U.S.C. § 1536, and is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law, in violation of the APA, 5 U.S.C. § 706.  NMFS failure to adequately respond to public comments on the draft BiOp is also a violation of the APA.  These actions by NMFS have caused or threaten serious prejudice and injury to Plaintiff's rights and interests.

### THIRD CLAIM FOR RELIEF

### (MSA Violations)

86.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

87.     The Agency violated the MSA by ignoring the recommendations and concerns of the NPFMC and by promulgating a fishery management regulation that fails to comply with the requirements of the MSA.  The MSA requires, among other things, that any fishery management regulation shall be consistent with ten National Standards for fishery management and conservation. 16 U.S.C. § 1851(a).  The Interim Final Rule promulgated by the Agency constitutes a "regulation" as that term is used in 16 U.S.C. § 1851(a).

88.     NMFS failed to follow the MSA established procedures for issuing regulations pursuant to the MSA.  16 U.S.C. §§ 1854 – 1855.  NMFS's issuance of the Interim Final Rule is without MSA authority.

89.     The Interim Final Rule is in violation of the National Standards at a minimum because, among other things, it:

Freezer Longline Coalition v. Jane Lubchenco et al.

A.      fails to achieve optimum yield of the Pacific cod fisheries in

the Aleutian Islands, instead potentially leaving significant percentages of total

allowable catch unfished (National Standard 1);

B.      is not based upon the best scientific information available (National Standard 2);

C.      fails to allow for variations among, and contingencies in, fisheries, fishery

resources, and catches, because it failed to analyze and avoid the cumulative

effects of the potential displacement of fishing effort from the Aleutian Islands

into the GOA and Bering Sea (National Standard 6);

D.      fails to consider the importance of the relevant fishery resources to fishing

communities as reflected by the best available economic and social data, and

instead ignores that data; as a result, the Interim Final Rule will effectively

prohibit those communities from continuing their historical participation in the

fisheries and related industries, and will maximize rather than minimize the

adverse economic impacts on those communities (National Standard 8); and

E.      fails to minimize bycatch; the rule will instead force Plaintiffs' and other vessels

into already-congested fishing grounds outside the Aleutians, increasing

competition, crowding, displacement, sector instability, and bycatch rates

(National Standard 9).

90.    The Agency provided only four summary paragraphs in the final EA/RIR that

purport to demonstrate compliance with the National Standards.  *See* EA/RIR at 11-1, 11-2. The

Agency's determination of compliance with the National Standards is unsupported, inadequately

explained, and devoid of a rational basis.

Freezer Longline Coalition v. Jane Lubchenco et al.

91.     In issuing fishery closures, through the Interim Final Rule, NMFS violated the MSA by failing to ensure that the closures:  (i) are based on the best scientific information available; (ii) include criteria to assess the conservation benefit of the closed area; (iii) establish a timetable for review of the closed area's performance that is consistent with the purposes of the closed area; and (iv) are based on an assessment of the benefits and impacts of the closure, including its size, in relation to other management measures, including the benefits and impacts of limiting access to users of the area, overall fishing activity, fishery science, and fishery and marine conservation.  16 U.S.C. § 1853(b)(2)(C).

92.     The Agency's promulgation of the Interim Final Rule violated the MSA, and is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right or without observance of procedure required by law.  This action has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests, is reviewable under the APA, 5 U.S.C. §§ 701-706, and the MSA, 16 U.S.C. § 1855, and entitles Plaintiffs to the relief requested below.

## FOURTH CLAIM FOR RELIEF

### (NEPA Violations)

93.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

94.     NMFS did not adequately consider the potential for significant environmental effects from the proposed action.  Among other failings, it did not adequately consider the context and intensity of the potential adverse environmental effects; fully consider or properly analyze socioeconomic effects; and failed to comply with NEPA' s requirements for addressing incomplete or unavailable information.  *See, e.g.*, 40 CF.R. §§ 1502.22, 1502.16, 1508.9, 1508.10.

95.     NMFS failed to adequately consider and evaluate the complete scope and effect of the potential direct, indirect, and cumulative effects and their significance here, including potential economic, social, environmental justice, and other environmental effects.
NEPA requires NMFS to prepare an EIS where there is a potential for significant environmental effects.  As NMFS acknowledged in December 2007, the effects of this action may significantly affect the human environment under NEPA and its regulations; yet NMFS abandoned preparation of an EIS to accompany the BiOp and prepared only an EA.

96.     NEPA also requires NMFS to prepare an EIS when there is substantial dispute as to the size, nature, and effect of the action, making the proposed action "controversial."  The minor modifications made to the draft RPA as a result of public comment do not make the final agency action "not controversial."

97.     NMFS failed to consider an adequate range of reasonable alternatives in the EA/RIR, including an alternative or alternatives more narrowly tailored to conserve fishery resources for Steller sea lions while providing opportunities for fishing fleets.  NMFS failed to present alternatives that reasonably satisfied the purpose and need of the proposed action. NMFS also failed to adequately consider additional reasonable alternatives including an alternative recommended by the NPFMC, which included less restrictive measures still designed to support the survival and recovery of the Steller sea lion and the conservation value of its critical habitat.

98.     NMFS violated NEPA and its implementing regulations by failing to provide the public with an adequate opportunity to comment.  NMFS effectively precluded adequate public involvement in the decision-making process and the opportunity to comment on the EA by providing an incomplete draft lacking significant information regarding the likely environmental,

economic, and social impacts of the proposed action and alternatives.  NMFS provided the public

with an inadequate period of time within which to provide comments on the draft EA/RIR, and

did not provide a comment period on the final EA/RIR and the FONSI before taking final agency

action on the Interim Final Rule.

99.     NMFS violated NEPA in failing to: (A) adequately consider potential

environmental effects of the action; (B) prepare an EIS on the proposed action, which may

significantly affect the human environment; (C) sufficiently analyze alternatives; or

(D) sufficiently provide for public comment.  These violations of NEPA, 42 U.S.C..

§ 4332(2)(C), (E), and its implementing regulations are arbitrary, capricious, an abuse of

discretion, otherwise not in accordance with law, or without observance of procedure required by

law, which has caused or threaten serious prejudice and injury to Plaintiff's rights and interests.

The agency's actions under NEPA are reviewable under the APA, 5 U.S.C. §§ 701-706; and

Plaintiff is entitled to the relief requested below.

## FIFTH CLAIM FOR RELIEF

### (Violations of the RFA and APA)

100.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

101.     The Agency violated the RFA, 5 U.S.C. §§ 603, 604, 609, by failing to prepare a

Regulatory Flexibility Analysis that adequately considers the impact of the Interim Final Rule on

small businesses and small governments.  Specifically, by issuing the new fisheries measures

without notice and comment, NMFS failed to satisfy its obligation to examine the effect of its

rules on small businesses and governments.

102.     In its August 2010 Draft EA/RIR, NMFS explained that the impacts of the RPA

on fishing and related businesses will occur over a number of years. NMFS determined that

Freezer Longline Coalition v. Jane Lubchenco et al.

focusing on costs in one year could understate actual impacts, while summing impacts over all

years could overstate them.  August 2010 Draft EA/RIR at 10-78. NMFS further explained that

"the standard approach to dealing with these issues is to estimate the present value of the costs,

where the present value is the sum of the costs across all years, where the costs in future years

are suitably discounted."  *Id*.  Accordingly, it estimated potential revenue losses to the impacted

fisheries as between $1.8 and $3.8 billion.  August 2010 Draft EA/RIR at 10-78 to 10-79.

In its Final EA/RIR, however, NMFS did not provide any estimate of the present value of the

revenue at risk from implementation of the preferred RPA.  Attempting to justify its decision to

reverse its position and diverge from what it previously identified as the standard analytical

approach, NMFS stated that:

> In the short run, alternative measures may be identified at some
> time in the future that allow the Secretary to act to authorize more
> Atka mackerel and Pacific cod fishing in the Aleutian Islands,
> without creating a risk of jeopardy or adverse modification of
> habitat. Alternatively, the actions could be in place for many years,
> pending down-listing or delisting of the western population.
> Because of the difficulty of identifying an appropriate time frame
> for this action, this analysis does not include an estimate of the
> present value of the revenue at risk from this action. . . . The July
> 2010 draft of this analysis, prepared for the Council's special
> August 2010 Council meeting on the draft FMP biop, included an
> estimate of present value. That has not been included in this draft.

Final EA/RIR at 10-125.

     103.    These violations of the RFA are arbitrary, capricious, an abuse of discretion,

otherwise not in accordance with law, or without observance of procedure required by law,

which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests, are

reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested

below.

Freezer Longline Coalition v. Jane Lubchenco et al.

## SIXTH CLAIM FOR RELIEF

### (Violations of the MSA and APA)

104.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

105.     The APA and the MSA require the Secretary to give notice of any proposed rulemaking in the Federal Register and provide an opportunity for public comment.  5 U.S.C. § 553(b); 16 U.S.C. § 1854.

106.     The APA, but not the MSA, provides that notice and comment may be waived by an agency when it "for good cause finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B). The Agency improperly invoked the good cause exception under the APA in promulgating the Interim Final Rule, and had no statutory basis to waive notice and comment rulemaking under the MSA.

107.     Waiver of notice and public comment related to the Interim Final Rule under the APA was without good cause because, among other things, any impracticability to complete normal notice-and-comment as claimed by NMFS is due to the agency's own delay in a four-year plus ESA consultation process, and not a present need for urgent action.  There is no conservation emergency with respect to the western DPS, which has stabilized or increased when taken as a whole during the seven years in which the current mitigation measures under the 2003 BiOp have been in effect.  There is no conservation emergency related to management of the groundfish fisheries, and in particular with respect to the Atka mackerel and Pacific cod fisheries, which are conservatively managed by NMFS, are not overfished or in danger of being overfished.  Given these circumstances, it was not impracticable for NMFS to comply with the APA and still carry out its mission.

108.     These violations of the MSA and APA notice-and-comment requirements for rulemaking are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law.  These violations have caused or threaten serious prejudice and injury to Plaintiff's rights and interests are reviewable under the APA, 5 U.S.C. §§ 701-706, and the MSA, 16 U.S.C. § 1855, and entitle Plaintiff to the relief requested below.

109.     The issuance of the Interim Final Rule is final agency action reviewable pursuant to the APA, 5 U.S.C. §§ 701 *et seq*.  A judicial determination is necessary and appropriate at this time under all the circumstances in order that Plaintiff may ascertain their rights and the Defendants' obligations.  Unless such a declaration is issued, Plaintiff will suffer a loss and/or impairment of their rights and property in violation of law.

110.     Plaintiff has no plain, speedy and adequate remedy in the course of law; absent immediate judicial intervention, Plaintiffs will suffer irreparable harm.  Plaintiffs therefore seek declaratory and injunctive relief against the Defendants as set forth below.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.      Expedite consideration of this matter pursuant to 16 U.S.C. § 1855(f)(4);

B.      Declare that the Defendants violated the ESA, MSA, APA, NEPA, and RFA;

C.      Declare that the Defendants' actions, as set forth above, were arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law;

D.      Vacate the BiOp, the RPA, the EA/RIR and FONSI, and the Interim Final Rule, and, if appropriate, remand with an order with instructions requiring full compliance with the ESA, MSA, NEPA, RFA, and APA;

E.      Enjoin the Defendants from relying on or enforcing the BiOp, the RPA, the EA/RIR and FONSI, and the Interim Final Rule;

F.      Award Plaintiff its reasonable attorney fees, costs, expenses, and disbursements, including attorney fee associated with this litigation; and

G.      Award Plaintiff other and further relief as this Court may deem just and equitable.

DATED this 12th day of January, 2011.

STOEL RIVES, LLP

Ryan P. Steen, AK Bar No. 0912084
Jeffrey W. Leppo, AK Bar No. 0001003
600 University Street, Suite 3600
Seattle, Washington 98101
Phone: (206) 386-7641
Fax: (206) 386-7500
Email: rpsteen@stoel.com
         jwleppo@stoel.com

*Attorneys for Plaintiff Freezer Longline Coalition*